Thank you. Chief Judge Kaczynski, Judge Wallace, Judge Smith, may it please the Court, my name is Brian Murray and I represent the appellants and the class in this case. My clients are people who lost their entire investment in a company named Saxton Inc. They are people who invested after-tax dollars, actual cash, in this company in reliance on the public statements this company made, which, quite frankly, were false from top to bottom and it's hard to find anything in the public statements of this company that was true. The revenue, the expenses, the loan obligations, profits, what their assets were, all false, all wrong, and indisputably so. You don't have to take my word for it, they restated it, they've admitted all of that. There's virtually nothing about this company that was legitimate. This company went public in June of 1997. They had, as far as we can tell, two legitimate operating quarters. As soon as 1998 rolled around, apparently the company was headed straight downhill, and the only way to keep this company afloat was to start lying about what they were doing and how they were doing it. This is a construction and real estate company in Las Vegas. That market was booming during the time in question. They should have been making money. I don't know why they weren't, but they weren't. The company was going downhill, and they didn't have sufficient money to keep going, and there's only one way to keep it going. And my opponents keep focusing on, in their brief, on why would they do it, what's their motive. It's quite simple. It was the only way to keep the company afloat. This was a small company. Mr. Saxton owned a large part of it. I think we understand your argument. We've all read your briefs, and we understand the case, and we thank you for your fine brief. But now there's questions we want to ask to sort of flesh out your argument. And I'd like to have you turn your attention to loss causation, which is an issue that concerns me, and I haven't made up my mind on it, but I want to get your view. As I understand it, from reading the briefs and the record, your side admits that the alleged misrepresentations, whatever they were, were never disclosed. That is, that the public never became aware of these misrepresentations. If that's true, then how would the market be affected? That is, your argument is based upon the idea that because of these misrepresentations, the stock had an artificial price, and your clients suffered. But if the market never knew about it at the time they made the purchases, and apparently it's that is the story, that during this window of purchasing time it was unknown, how is the market affected? Certainly, Your Honor. And the answer is very simple. Our basic theory of the case is that they were presenting false misleading financial statements, which inflated or at least supported the price of the stock, and then when the truth came out, the stock went down. Now, specifically Is that your gradual leak theory? Yes, Your Honor. I mean, specifically to answer your question, the precise details of how this fraud was committed, all of the details that we put in the complaint about the Taylor Ranch, the U.S. mortgage, the Corte Madera, et cetera, the precise details about how the fraud was committed were not fully revealed until after the class period, and the company was bankrupt. But throughout the class period, they were issuing statements that made the stock go down, that were partially revealing the fraud, not the exact details of the fraud, but the effects of the fraud. For instance, when they say we're having asset valuation problems, which ties into their TCP allegation in the complaint, the stock went down. Now, you didn't find out exactly the details of that until the end of the class period. There's another point, and I'd like to refer you to the next slide. Well, so if you assume that perhaps you can help me with this. If you assume that the market was not aware, let's assume the misrepresentations are correct for the purpose of this question. Let's assume also the market was unaware of what took place so that when they purchased stock, they could not have had anything to do, making their decision would have nothing to do with the allegations or the of their buying the stock somehow attached to something about which they had no knowledge when they made the purchase. Well, Your Honor, you never have knowledge of the fraud when you make your purchase. That's why you've been defrauded. I mean, all they knew was that the company was reporting certain financial results. That's what they're relying on. I mean, they don't know at the point that they make the purchase that they're being defrauded. Otherwise, they wouldn't be relying on the fraudulent statements to begin with. They would not have been defrauded. Your claim is that the statements they were making about the financial condition were false. Yes. They were representing a company that sounds financially. In fact, it was rotten to the core. Exactly, Your Honor. That's exactly what we're saying. And in fact, I refer you to I mean, just to use a metaphor. I'm sorry? That was just to use a metaphor. Yes. That the financial structure which appeared on the outside was based on a hidden loans and things that really were false. It really was a metaphor, Chief Judge Kuczynski. This company was rotten to the core. I mean, virtually every single statement they made was false. I didn't mean to be making any judgment. I was trying to characterize your claim. I understand, Chief Judge. Counsel, are you still answering? Yes. We're going to have one minute further to address Judge Wallace's concerns. If you look at the statement on March 23, 2000, during the class period, they announced a, quote, debt restructuring, which really goes to the heart of the case. This company was burdened with tremendous undisclosed debt, particularly the $8.5 million that they borrowed and claimed as revenue from the U.S. mortgage Taylor-Wrench deal, the $2.5 million from Corte Madera. In fact, there was a prior decision of this very court, an unrelated case against I don't have the citation exactly with me at the moment, somewhere in my papers. There was a prior decision of this court, it's U.S. Mortgage v. Saxton, Inc., where it details 18 different private loans that Saxton received to keep the company afloat using their stock as collateral just to get a cash infusion to keep Saxton, Inc. going and hopefully turn things around and take advantage of the Las Vegas real estate market. They announced the debt restructuring, which was tremendous, and the stock goes down 23%. And as Dow says, the true nature of Dow's financial condition had not yet been revealed, and that's what needed to be revealed, and slowly and gradually it was through various statements which we have identified in the complaint. Sorry, Judge Smith, you want to question? The case is Comey v. Deloitte & Touche, but Deloitte & Touche isn't here anymore. Correct. Saxton isn't here anymore. The company, it's in bankruptcy. We really have a case against three potential officers of the company. Correct. The Saxton, James, the Sher, Kirk, and Sullivan, Melody. Reading your complaint, as I must, and all the things that are attached thereto, or I can take judicial notice thereof, my worry about the scienter is that one must show with particularity both facts constituting violation and facts evidencing the scienter, but we're not talking about Saxton. We're not talking about Deloitte. We're talking about individual defendants. Yes. And me reading your complaint, I guess, I wondered where I found the, if you will, those allegations set out in sufficient detail to constitute the strong circumstantial evidence as to these three. I mean, there's a general allegation they're officers, and there's a general allegation as officers, they're there. Saxton was making loans, or getting into the loans. But I guess I'm trying to figure out, based on the standard, where we get to the scienter. Certainly, Judge Smith. And to be quite honest, I don't think this is a case where you have to look for somebody's signature. You can just look for the signatures. James Saxton, the President and CEO, signed everything. He negotiated everything. He is the one who personally signed the U.S. mortgage loan documents. I understand that he entered into the loans. Mr. Shearer is the one who. What I'm looking at is the violations, the facts evidencing the violations you now want to prove. That he was there, that he did them, that he was involved with sufficient detail that I can say you're it. Well, Your Honor, I'm not quite sure what your question is. I mean, if he's the one that's signing the documents for the loan and taking the money into the company, I'm not sure what more you need than that. I mean, he's obviously aware of exactly what's going on. He's the principal involved in negotiation and he's signing all the documents. I mean, what else could you possibly need to show that he knows exactly what happened in that transaction? Could I follow up on Judge Smith's question because it's one that bothered me also, but perhaps from a different direction? This is your second grand opportunity to come to the Ninth Circuit on this case. Yes, it is. And before, when we had the case, we trimmed it down somewhat. We indicated that, based upon the allegations in the complaint at that time, that they were insufficient, but you should have an opportunity to amend. Now, in fact, you alleged, we stated at that time, we talked about this signing for loans, and we talked about all these issues and we said that wasn't enough, just what Judge Smith is talking about. So my question to you is I thought we were very precise about there's a failure to plead the necessary scienter in strong enough language. What change did you make in your complaint, which is different from the complaint that we examined before, which we said was insufficient? Well, that's a fair question, Your Honor, and there's a simple answer. In the initial complaint, which was dismissed, which I was up here on the first time, none of these details were in there. The only reason that I could tell that I was given leave to amend by the prior Ninth Circuit panel was to include all of these details that we put in about the Taylor Ranch, the court in Madera, et cetera, et cetera. Those details were missing from the first complaint, and it was for that reason that I was given leave to amend the complaint and put them in. When I stood before the panel the first time, I presented the case, our theory of the case, that this company was involved in Enron-type accounting before that became a household word, that they had tremendous off-balance sheet transactions, that they were masking all of their loans, that Mr. Saxton was signing the loans, that he was aware of it, and all of that was not an initial complaint, and I was given leave to amend and go put that back in the complaint, which I did. When we had this case before that talked about Saxton, I guess that's the person you're talking about, signed for unreported loans made to Saxton, signed unreported interest payments checks, authorized improper capitalization, et cetera, et cetera. Our prior panel covered all of those issues and said they were insufficient. I don't understand why they're now sufficient. What changes have taken place in your complaint that make what we held was insufficient before now sufficient? Well, Your Honor, there is much more detail, for instance, concerning the Taylor Ranch and U.S. mortgage transaction, none of which was in the first complaint. And just to briefly summarize, and I know I'm what they were calling a soccer game injury time after the game is over, but Taylor Ranch, and this was not in the first complaint, that was a transaction where the company bought a certain amount of undeveloped property for $35,000 an acre. They were not given permits to develop the property. It was basically a white elephant on their hands. And that was what they conveyed partially, 26 acres of that parcel, in the so-called U.S. mortgage transaction for $8.5 million, $5 million of which was supposed to be a, quote, construction down payment, which the bankruptcy examiner found. There was no construction ever. They didn't break earth. In essence, they sold 26 acres to an entity which James Saxton was controlling. They sold those 26 acres that were $35,000 purchased the year before and which appreciated in the market and should have sold for about $50,000. If all they gave was the 26 acres in consideration for that $8.5 million, they got $300,000 an acre for it. Those are the changes in your new amended complaint. Yes, Your Honor. All right. Well, we'll let your colleague tell us why they were insufficient. I was just going to suggest the problem that I had is that just exactly where Judge Wallace was going, I looked very carefully at what we did before and looked at the allegations. And it seems the allegations are much the same. You suggest that Saxton arranged the loans and didn't have them disclosed. But there are facts that the practice was explained on the financial statements and that's how they did the business. I mean, that's right there. You allege he knew of the mortgage and the loans that were not disclosed. But I didn't see any place where he alleged that he did this with the intent to deceive, manipulate, or defraud. I mean, that's the kind of stuff that I expected somebody to suggest. I understand your question, Judge Smith, but it's virtually impossible to put exactly what you're asking for in a complaint to say that I know without ever having any evidence or deposition of Mr. Saxton why he did this. I mean, all you can do is draw the inference that if he's taking in money as a loan and he's recording it as revenue, he's doing it on purpose. I mean, it doesn't happen by accident. I mean, there's no way that this is a slip. I mean, there's a specific reason that he's taking this money in and recording it as revenue when it's actually a loan. I mean, it's not the ñ it is inconceivable that all of a sudden he was like, oh, I didn't realize that was a loan. I mean, he obviously knew what it was. That's exactly what the Bankruptcy Examiner found, which, in fact, is additional allegations we put in the complaint concerning what the Bankruptcy Examiner and the Bankruptcy Judge found with regard to these transactions. You know, in answering Judge Smith's previous question, you talked about Saxton, but there are two other defendants. And how do you tie these ñ the Sienta to these other two defendants? Sure. With regard to Mr. Shearer, he was the CFO when he was at the company, and he was ñ he personally signed, and we included all those factual details in the complaint, the interest payment checks that they were making on these loans, which interest payments were not disclosed in the financial statements. So certainly he was aware that they were paying interest on somebody else's, quote, loan when it was actually their loan and that they were the guarantors on it. With regard to Ms. Sullivan, I admit it's somewhat more tenuous. She was the Chief Accounting Officer during the time period. Unlike the previous case where there was 26,000 employees, Saxton had about 200 employees at this time. It was a small company. But the Chief Accounting Officer ñ and they don't have a lot of transactions. It's not like at the end of the day they're going through, you know, 1,000 different transactions. They had, you know, a few discrete real estate deals. But the Chief Accounting Officer could not understand what was going on on five or six deals during the class period is, quite frankly, inconceivable to me. And, yeah. So as to her, you only ñ your proof of scienta is that somebody in her position would certainly have known. Yes. There's nothing more than that. I mean, as to Saxton, you have signatures on loans. I gather as to ñ what was the second defendant? Mr. Shearer. Mr. Shearer. Mr. Shearer, you have to put two and two together. You have to say he knew about the payments. You also have to say that he knew about the disclosures, that he was somehow involved in the ñ in reviewing the disclosures. The financial statements, you mean? I mean, when you say reviewing the disclosures, if you mean the financial statements, I mean, that's his job. He's the Chief Financial Officer. There's no way he could not be aware of the financial statements. I'm sure that that's obvious to you. I don't know anything about corporate governance, so I'm willing to believe you. I'm not being difficult here. I understand. So as Corporate Financial Officer ñ I'm sorry, as Chief Financial Officer, he would certify the financial statements? Exactly. Yes, Your Honor. Okay. This may be perfectly obvious. I just want to make sure I understand the connection. But as to the third named defendant, what we have ñ there's nothing structural like, you know, signing of loans or being the one who certifies financial statements. There's simply she was around in a position and she must have known. Yes, Your Honor. We don't have the hard evidence. That's the nature of your connection. Yes. I don't have the hard evidence on Ms. Sullivan that we have on Mr. Shearer and Mr. Saxton. That's very kind. I just want to make sure I understood the connection as to all three. No, absolutely. But somebody ñ We have taken more than your time. You may sit. We'll hear from the other side. Thank you, Your Honor. Unless my colleagues have further ñ you may proceed. Good morning. David Furbush, appearing on behalf of Jane Saxton, Kirk Shearer, and Melody Sullivan, the defendants below. The Court dismissed the complaint the second time around on two independent grounds. One was that the plaintiffs had failed to meet the PSLRA's requirement of pleading specific facts giving rise to a strong inference of scienter as to these individual defendants, and secondly, that the plaintiffs had failed to plead loss causation as required by the Dura case.  It's hard to do on the first one, isn't it? Hard to affirm on ñ On the first one. I mean, they say they had these phony loans. They have now come forward with evidence that these people knew, at least two of them, pretty hard evidence they knew about these phony loans, and they weren't disclosed and ñ or they were misrepresented. What more do they need? Your Honor, I ñ you know, the word phony loans does not appear anywhere in the complaint, and I don't even know what phony loans would mean in this situation. There would ñ I can spell it out for you. Yeah. If you don't understand. What they claim is that there was a loan given by a shell company and that was guaranteed by this company, by the defendant, by the principal defendant who is now in bankruptcy, and that essentially it was a claim against the company's assets that did not show up, did not show up. So they show the proceeds of the loan, but they didn't show the increase in liability that the company suffered as a result of taking on that liability, and that this liability was quite material. It came under to at least $11 million, which for the size of the company is pretty significant. So let's take the ñ That's what they're alleging. So let ñ Am I confused here? Let me take the example of the court in Madera Loan. Let me ask ñ you answer my question. Am I confused here? Are they alleging something other than what I've just explained? I could get into detail about what I believe they're alleging, Your Honor. And that is ñ You know, it's your time. I'm asking you whether I got it essentially right as to what they're alleging. If you ñ if I have it wrong, there's no use in your answering the question because then you're ñ I don't think you have it exactly right, Your Honor. But I would be happy to try to give you a more precise statement of what I believe they've alleged. If you think it's material, you should look at the usual group. I do, Your Honor. I do, Your Honor. So in the case of the court in Madera transaction, they allege that there was a limited liability company called Corte Madera LLC. They allege specifically that Saxon was the manager of Corte Madera LLC.  The LLC is the entity that runs the business. Okay. It's sort of like the decision-maker for the LLC. The only ñ that indebtedness for an LLC can only be incurred by the manager. They allege that Saxon, as the manager, signed the loan documents for Corte Madera. The reasonable inference from that is that Corte Madera was the borrower on the loan and not that Saxon, the manager, was the borrower on the loan. So I don't think that that's a, quote, phony loan, Your Honor. I think that that is ñ it's a transaction by a manager on behalf of an LLC. Now, the real question is what's the proper accounting for that transaction? Is there an obligation for Saxon? You left out the part about whether the company guaranteed the loan, didn't you? And they also allege ñ If it was just a loan to this company, it wouldn't matter. The tie-in is to the company here, the one that's in bankruptcy, which guaranteed the loan and wind up paying it off. Right. They also allege ñ But that's an important fact not to overlook. Yeah. They also allege that there was a guarantee by Saxon of the Corte Madera loan. They allege that under GAP that should have been disclosed, not necessarily reported as a liability, but in some way disclosed as a contingent liability. And they allege that that was not done. You got it. Okay. I left out the GAP part, but yes, that's right. Right. Why isn't this exactly the kind of manipulation that ought to be disclosed and that ought to be liability for failure to disclose? Well, again, Your Honor, the question is not so much should there have been a balance sheet adjustment for a contingent liability. I don't think GAP says that that would be ever required. But it's should there be simply a disclosure of the possibility that there could be a liability in the future. That's what a contingent liability is. So the answer to your question is why shouldn't there be ñ if their allegation is true, that there was a contingent liability in the form of a guarantee that was not disclosed, if that is true, then your question is why should there not be liability for that? And the answer is two reasons. One, they would have to show that the failure to disclose involved scienter. That is, that someone knew or recklessly disregarded a material fact. They would have to show it was material to begin with. They would have to show scienter with regard to that material fact. Usually failure to comply with GAP is material. I don't think that's ñ Isn't that why you have generally accepted accounting practices? Because that is sort of the framework for which everybody ñ that's the language everybody talks. So when you make financial disclosures, which are quite complicated and often involve a lot of assumptions and inferences, you have to be talking the same language. You have to be ñ when you use a term, it has to be the same meaning as in every other financial statements, or else financial statements don't mean a thing. And that's what GAP is. And, you know, isn't the failure to ñ isn't the omission of something that generally GAP would require to be disclosed, isn't that inherently a material omission? Not necessarily, Your Honor. It would depend on the magnitude of it. Well, explain it to me. I mean, well, of course I'm playing the magnitude. If you're talking about $3, it wouldn't matter. But here you're talking about $11 million in a company whose worth was not $6 billion or $27 trillion or anything of that sort. Materiality ñ Where $11 million made the difference between financial health and financial ruin. Your Honor, in this particular example, materiality is not where I want to focus my argument. I'm simply pointing out ñ I know you'd like not to, but this is where I want to focus your argument. Your Honor, let me concede ñ Well, if you want to concede that this was a material omission, we can then go ahead and talk about something else if you choose. If you want ñ is that what you're saying? Okay. I'll concede that. This is a material omission? I'll concede that it was material. Okay. Then there's no point in talking about it. So the key questions then are, was there any scienter with regard to that? And secondly, was there any loss causation associated with that? And that's ñ Let's leave loss causation to one side because that's a different issue altogether. So let's just talk for a minute about the knowing omission of a material item in the financial reports, the financial statement, which ñ well, it's material, so it's ñ by definition affects the ñ its inclusion would have changed the picture that the financial statements would have presented to the public. Why isn't that a perfectly good basis for them to go in and now try to prove scienter and go to a jury and try to get damages? You know, there's a long list ñ there's a long history of cases in this circuit saying that GAP violations do not by themselves establish scienter. You know, you ñ they don't, but you've already admitted materiality and omission. On the question of scienter, we can't resolve that on the complaint. That's the kind of stuff that goes to the jury. And if, in fact, you had a jury verdict here based only on GAP, you might be able to set it aside as being insufficient. But my guess is by the time they get through with your clients and discovery, there's going to be a pile of other evidence of scienter, and they're not going to have to rely on GAP alone. The question you have to answer is why isn't a material omission from the financial reports, which you've admitted is a material omission, enough to let them get to a jury and discovery to prove up scienter? Because the Reform Act says that the plaintiffs need to plead particular with this. The Reform Act, the Private Securities Litigation Reform Act, requires that the plaintiffs at the pleading stage plead particularized facts, giving rise to a strong inference of scienter. And this circuit has a long history of cases that we've cited in our briefs saying that a GAP violation alone does not constitute evidence of scienter, that ñ that there needs to be something else. This man signed the documents. This is not some lofty CEO up there who says, look, there's things going on beneath me, six levels beneath me, in Frankfurt, in our Tokyo office, in San Paolo or something, and I couldn't be responsible for everything. This man signed the documents himself with his own fingers. James Saxton you're referring to. That's the guy I'm talking about. Right. We can talk about the next guy in a minute and about the miss, the third defendant. But the one defendant signed the documents himself. He was on top of everything. Once you've admitted, as you have standing there, that this was a material admission, I don't see how you can maintain that the case can't go forward. I think at that point you've sort of given up the ship and you're sitting there paddling your way on a lifeboat. No, you're right. I admitted that it was material, conceded for the purposes of this argument that it was material in terms of, you know, the standard of materiality. There's no for purposes of argument. You've conceded it. If you want to take it back, we can let you take it back. I only let you go right on to the next point because you said, okay, you're not going to, you know, you conceded this. If you – there's no such thing as sort of a hypothetical concession. This is now established. This is now established in this case. Just to be precise, Your Honor, you said material admission. I said material. That the magnitude of the loan guarantee, I think, probably would have been considered material in the context of Saxton. Okay. So what are you quibbling with here? That there were – I'm not – It wasn't omitted? You're saying, in fact, it was there, but they missed it somehow?  I'm saying that they've alleged that there was a loan guarantee that was not disclosed. And you said it was material? Yes. You've now nailed that one down. Right. And you're saying it was material but not omitted? Are you saying that? That if I now look at the financial report, I will find this loan disclosed somehow? We all missed it up to now? The loan – I don't believe you will find the loan guarantee disclosed. Okay. So are you admitting omission? Are you sort of just standing there and saying, taking the fifth? What's going on with the omission? I don't know if – I do not know the details of the loan guarantee. I know what's been alleged about that. Right. Of course, we're talking about what's been alleged. We're not talking about what's been proven, because there has been no chance to prove anything. Right. But you've admitted that they have attached – they have alleged something that's are you really quibbling? They have alleged that it was omitted, Your Honor. Okay. So there was an alleged omission that is both material and – I mean, there was an item that's both material and omission. So how can you win at this point? What's left for you to possibly survive this? What – you know, let's say I were to write an opinion in this case, and I'd have to say, you know, counsel admitted this. How would I make it come out for you? Sure. I'll give you another admission, Your Honor. No, no. Just tell me how I would write it. Sure. To come out your way. Companies make mistakes in their financial statements, as this company admittedly did when it restated the interest – capitalized interest. Yeah. You can claim – you can argue to the jury when you have a jury that this was not – this was not knowing, that it was not sciento, that they made a big, huge mistake. Yeah. But that is not a basis for dismissing a complaint. And you know it. And I know it. Everybody in this courtroom knows it. So I don't know why you're standing there arguing this. I mean, the fact that you have a good defense is not novel. You know, every case involves a defendant who claims they didn't do it, that the things that the plaintiff alleges are all false, and boy, God, you know, the facts are different. That's nothing new. I have to respectfully disagree with you, Chief Judge Kaczynski. The fact that there was a mistake made in the financial statements – You claim it's a mistake. They claim it was a manipulation. This is your version of the facts. You say, oh, whoopsie, we made a mistake. That is a defense. That is not a basis for dismissal. Tell me how I'm going to write this opinion, giving it to you after you've made the admissions you've made today. Sure. I will be happy to do that. Please. Start with the proposition that it's the plaintiff's burden to plead particularized facts giving rise to a strong inference of scienter. The fact that a mistake was made in the financial statements, as the company admitted when it restated its financials, does not give rise by itself to a strong inference of scienter. Even if the financial statements were signed by Mr. Saxton, that does not give rise to a strong inference of scienter that the person who signed them – And they have admitted as a must that the president of the company signed all those loans and was – therefore negotiated the loans, was intimately involved with the loans. Right. But this is not strong proof that he actually intended anything bad. He could have forgot. Right. He could have. That's how I drive that argument. He could have forgotten. He could have been relying upon the expertise of others. This is a company that – So how does a plaintiff ever disprove the possibility of, whoops, I forgot? Even when – you know, do you have to find something – does plaintiff, even before discovery, have to find a piece of paper saying, I'm out to defraud the public? The plaintiff does not have to prove anything at the pleading stage, but it does have to plead facts giving rise to a strong inference of something. Well, what are the facts? I mean, why isn't the fact that the president of the company signs – personally signs these loans that you have said are material emissions, why isn't that a strong inference? Sure. Let me – Why doesn't that give rise to a strong inference? Because the courts have said over and over again that – including this Court – that the mere fact that there was a material error in the financial statements is not itself sufficient to infer scienter. And in this case – when this case was first – Did you hear my question?  Okay. Why don't you answer my question? I'm now writing an opinion saying, you know, they admit this is material, they admit this was emitted, and they admit as they must that the chief guy, the defendant here, signed the loans. These were not things that – that sort of were done by other people in the company that maybe he wasn't aware of, that he did these things personally himself. And I'll say, no, that's not enough to prove that he had scienter. We have to – we would have to add some confession on his part. Not necessarily. You know, we'd have to bring in his, you know, his advisor, somebody to whom he said, hey, hey, I'm out to – I'm out to build the public. Is that what you think he needed? Yes, something like that, Your Honor. When I – when I was first before this Court in this case, I conceded at that point that the company had made material errors in its financial statements, and that it was then required to restate them, and that the original panel accepted that concession, that, yes, the company had made material errors in its financial statements, those financial statements had been signed by at least one of the individual defendants in this case, and that panel nevertheless concluded that there was insufficient factual detail in the complaint to support a strong inference of scienter. But we're dealing with a different complaint now. We are dealing with a different complaint, but the concept is the same, Your Honor, that the fact that there's a material misstatement in the financial statements, even if the financial statements are signed by a defendant, does not by itself establish a strong inference of scienter. Did it deal with the fact that the defendant actually signed the loans? No. I don't think that that is sufficient either, Your Honor. Did the – did you hear my question? I'm sorry. Did the prior panel deal with the fact that Mr. Saxon signed the loans himself? I don't believe that was the focus of the argument, Your Honor. Is your answer no? No. Okay. I don't have anything further, unless my colleagues do, I think. We're done. On this particular issue that Chief Judge Kaczynski has been discussing with you, is that one of the new issues that was pled in the amended complaint after we have seen this case the first time? The loan guarantee issue? Yes. I don't recall if it was pled in the original complaint. It certainly was not a major feature of the appeal and the discussion at the time of the appeal. And I haven't gone back and tried to compare whether there was a reference to it in the original complaint or not. My question is where did it arise, in the original complaint or in the amended complaint that took place after we had seen this case? The short answer is I don't specifically recall now if there was any reference. Sorry? What did you say? I don't recall at this time whether there was any reference to it in the original complaint. It was not in our opinion, for sure. That's correct. Thank you. Okay. Now, I take it that your defense on this issue deals with the DSAM case on where Price Waterhouse indicated that they did a very bad job of accounting, but that alone only showed negligence and you need more to show scienter. Now, Judge Kaczynski indicates that, asked you the question of if the target has actually been involved in the process itself, why wouldn't that be sufficient regardless of the accounting principle? And I'm not quite sure I understood your answer of how you would distinguish or how you would apply our prior case to which I made reference. Sure. So let's, again, take the example of a loan guarantee signed by Mr. Saxton that Gap says should be disclosed in the financial statements. Not necessarily it's going to cause a financial adjustment in the balance sheet, but there should be some reference to a contingent liability, right? And so the argument for the plaintiff is that Mr. Saxton signed the loan guarantee and that Mr. Saxton signed the financial statement that didn't mention the loan guarantee. Now, does that give rise to an inference of fraudulent intent or not? I mean, I think that's the basic question that you're posing. And my answer is no, it does not. That the – first of all, Mr. Saxton is not an accountant. He relies on other people to handle the accounting issues. This is a company that was subject to annual audits. The auditors apparently didn't find any problem here. Mr. Saxton reasonably could assume that when the financial people are doing their job and the auditors are doing their job that the financial statements are accurate. People do make mistakes, unfortunately, as this company admittedly did in a different situation in the capitalized interest arena. But sometimes mistakes are made that are honest mistakes that are not made for any intent to defraud. So I think when you look at – traditionally when you look at the question of Scienter, you're looking at questions like, first of all, what motive would Mr. Saxton have to defraud – to do something like this deliberately or intentionally? And we pointed to the complete absence of any economic motive. To the contrary, Mr. Saxton was the – was – he was not selling any shares in the company. What he was doing was effectively – Did he own any shares in the company? Yes. He owned about – Why isn't that an incentive enough? I mean, the – if he discloses these things, the stock price would plummet and he would lose lots of money in his shares. Why isn't that an incentive? Isn't that the usual incentive? Isn't that why people manipulate stock? Because they own stock and they hope to make a profit by fooling other people into believing it's worth more than it is? No, Your Honor. I don't think – I mean, any – Your client was in this for airway mortionary purposes. No, Your Honor. He was doing this as a charity. No, he was not, Your Honor. But I think that he was not – He had deposited the stock with the Salvation Army. The – Is that what you're telling us? No. He owned the stock, right? He owned the stock, Your Honor. Well, why don't you answer the question? Why isn't – what – why isn't that plenty of incentive for him to lie to keep up the value of the stock? Why isn't that an obvious motive? The – first of all, that would – that would mean that Scienter would be found in just about every case, because I think in – You raised lack of motive as an issue, okay? Right. You raised it and said he had no lack of motive. Nobody else asked about it. You raised it as something that helps your client's case. And you made the statement, standing there with a straight face, he had no motive, when he owns these chunks of stock. And I don't quite understand why you say things like that when it's obvious that he does have a motive when he owns the stock. Now, if you want to say motive doesn't matter, that's fine. But why argue that he has no motive when it's perfectly obvious he does have a motive, and all you do is undermine your credibility by making arguments like that? Now, did your client have a motive? Did your client have a motive to lie about the value of the stock? Yes or no? Your Honor, in the – under these facts that are pled here – Yes, I don't think he had a motive. No. I don't think – I don't think you can infer any motive to lie about the stock on the facts that are pled here. Well, because you own a chunk of it, you can't have a motive. And he was effectively locking up his stock so that he couldn't sell it. He was going and pledging it to a bank to borrow money to lend to the corporation. He was pledging his – he pledged his stock to a bank as collateral for a loan so that he could then lend the money to Saxton. He was precluding himself from selling the stock. He was pretty much eliminating any possibility of personal profit from his stock by locking it up and reloaning the proceeds to the corporation. He was not doing this – Do you mean he would never get the stock back if he got away with it and everything sort of worked out right and things turned rosy later on? He would just say to the bank, no, you can keep the stock, it's yours? No. Obviously, if the company turned out to be a success, he would get – he would get the money repaid. So once again, you make statements that are demonstrably not true. Do you think you help your credibility or you help your case by doing that? Your Honor, his motive was to make the company a success. But that's a motive of every manager, every good manager of every company. That is not a motive to commit fraud. Let me ask my second question. You indicated at the beginning of your argument that there were alternative grounds upon which the district court made a determination. I talked with your adversary about loss causation, and I'm interested in that issue. Would you please indicate to me why you think your adversary was wrong, if you think he was wrong, in his argument that loss causation cannot be of assistance to you? So the Supreme Court in the Dura case said that what is required is something more than an allegation that the stock price was inflated at the time that the plaintiff purchased the stock, that there must also be an allegation and subsequently proof that the share price fell significantly after the truth became known. In this case, virtually all of the accounting issues that the plaintiff pleads were never the subject of any public disclosure. This is something that the plaintiffs in this case have come up with allegations that were never part of any public discussion about Saxton at any point in time. Its stock price was delisted. Its stock was delisted. It was no longer trading. And then, you know, years later, this case had been going on for eight years, you know, the plaintiffs came up with these, you know, new. Do you have the excellence of record with you? Yes, I do, Your Honor. Okay. Why don't you turn to page 178 and 179. This is page 69 of the complaint. I have the complaint. If you just refer to the paragraph number. Yeah. It's paragraph, starting about paragraph 215, 216. Okay. 178? It's 178 of the excerpts, 69 of the complaint. It is these excerpts here, the ones that says excerpts. He's in the complaint, Judge Wallace. Supplemental? This is supplemental excerpts. Yeah. You want to be in the original excerpts. Oh, okay. Why don't these paragraphs, I'm just going to talk here for a minute to allow my colleague to find them. Why don't these show that as the bad news was disclosed, that drop, that start, or allege, I'm sorry, I don't mean show because, of course, it's a complaint. This is 69 and 70 of the complaint. Okay. And I'm looking at paragraphs 215, 216, and 219. Got it. Well, all the intervening paragraphs. Why doesn't this show that as the bad news came out, the stock then proceeded to drop? And why isn't this enough of an allegation to show a loss causation? Because none of these paragraphs allege that the accounting violations that the plaintiffs are now claiming existed were ever disclosed to the public. What it alleges is that the company had a loss in the fourth quarter of 1999, which of course is bad news, but having a financial loss is not the same as disclosing that there had been some prior improper accounting. Well, it says it has experienced, this is what I'm reading at the bottom of page 69, experienced difficulty meeting its loan repayment obligation in a timely manner, and as a result, certain creditors have initiated actions to declare the company in default. Why isn't that a disclosure of these obligations and then followed as you go to the end of the paragraph a decrease of almost 25 percent in the share price? Yeah. There's no question that the share price decreased when the company announced it suffered a loss for the fourth quarter. No, but it was having trouble meeting its loan obligations and the creditors were now going after the company to declare a default. Yeah. None of that suggests any improper accounting. Are these the very loans we're talking about? I don't think so. Because they had this obligation because they were having to meet the guarantees that they had made? There's no allegation. They had not been disclosed? There's no allegation that that's what they're referring to in this. I see. So what you'd have to read is this is not referring to that. Okay. Well, maybe we'll let your opposing counsel explain to us what he means by this, but I think we've gone way over your time. Since you've gone over opposing counsel's time as well, but since we've taken so much time with you, we'll give the plaintiff two minutes for rebuttal. Thank you, Your Honor. Thank you, Judge. You might address the loss causation argument, which we didn't have a chance to spend much time on. Since I went so far over, I was not anticipating any rebuttal time, so I don't have pre-prepared comments, but I'll go into my loss causation speech. Well, you might look at the complaint and show us where you went into loss causation. I pointed to what I thought were the key paragraphs, but I may have missed what they were. And if they are the key paragraphs, you might want to explain to us how this is tied into your allegations of security fraud. Certainly, Your Honor. I think you did find the key paragraphs. I believe we also have a graph in the complaint. Oh, graphs are good. All right, this is the next page. But it's clearly a drop, and clearly there was bad news disclosed, but what your opposing counsel says is there's no indication, according to him, or there's no allegation that the bad news was in any way tied to the gap violation that you are alleging. Sure. Your Honor, what we've alleged, quite simply in this case, is that the company was going straight downhill and they were hiding those facts. One of the reasons it was going downhill was because of the massive debt obligations that they guaranteed for which they were making the interest payments on, which was slowly strangling and crippling the company and eventually drove it into bankruptcy. And that's exactly what we see in the paragraphs that you so aptly highlighted. They announced a debt restructuring, and that immediately drives the price of the company down 23.5%. I can state with absolute certainty that the debt referred to in that press release by the company is the debt we've alleged in the complaint, but I certainly think that's a fair inference. I don't know what other debt they could refer to. I mean, we've identified $11 million worth of loans that they were making interest payments on. There's no doubt in the complaint that they were making those payments. I think we even have check numbers listed. And that was the exact reason why the company was not able to meet their obligations and why the company slowly went into bankruptcy. Well, Counsel, you're missing the total point because his question was very specific, and I'm glad he asked it because if I'd had more time, I'd ask the same question. On loss causation, and I read every one of your loss causation paragraphs, and every place in your brief I do not find anything that says to me that paragraph 215, which my good colleague has referred to, has anything to do with what we're talking about because there's nothing to suggest any place here that there was an action to declare the company in default as a result of this. There's nothing that suggests that they were having difficulty in meeting the loan repayment obligations in a timely manner as to this. All I know is interest was paid. That's all I know. I mean, I've gone all the way down through this. I've tried to find a way during this period where we have anything to talk about because as I understand the law, it's during this period that you chose, the class period, that I've got to find something that causes loss causation as I understand it. Now, you tell me where in your complaint or any of your documents do I come up with the fact that this information that you're now alleging is the accounting problems is suggested such that I can see it's pled adequately because not knowing leads me to believe it isn't adequate. And you had a chance to go back. This Court sent you back and said plead it. That's why I was worried about the other one, see enter. I read everything this Court said about what you should do. And then I read your complaint. And then I read, I mean, I wanted to find out what did Saxton do wrong? What did he do? Okay, he enters into loans. What did he sign that shows to everybody that's out there looking at that he says this is the way it is? Go through each one of those three individual defendants. What did they do? Lay it out. That's what the pleading standard is. It's a heavy standard. It's not notice where I give anybody who walks into my courtroom, which I used to do in Idaho, a chance to say anything they want to say and they get through it because I find it. This says they've got to do more. It's like the old pleading standards that I had to do with my gray hair and no hair. It's big, and therefore that's why I keep asking you about those kind of things. It's not just say, well, we think it's going to happen. Your Honor, I agree with what you articulated with regard to Santer, but I do not believe it's the same standard with regard to loss causation. Under loss causation, we're still under a notice pleading standard under Rule 8. Well, I understand, but I've got to have something that says I'm in the ballpark  I understand, Your Honor. Take a look. I mean, to follow up on this very question, and I agree with Justice Smith, this is certainly vaguer than I would have liked to have it seen, so maybe you can explain it to us. Take a look at paragraph 216, and maybe you can explain to us what it actually says. It certainly does not spell it out very clearly, but maybe we're missing something here. Certainly, Chief Judge. Paragraph 216, I mean, you can read it for yourself. It obviously refers to that the company is saying the 1999 financial statements continue to be incomplete. There is this quote here. Let me just be very specific about this. Sure. It was disclosed. So it was a disclosure on April 24th about, quote, 1999 financial statements continue to be incomplete owing to certain unresolved asset valuation issues. Yes. Now, that's a very abstract description. It could mean anything. It could mean the company had land. I don't know what this company had exactly, but let's say it had a piece of land, and there was some title dispute as to the, you know, ownership of the land, and that would be an asset valuation issue. So if you have a title dispute, that would bear on the value of the land, or maybe there's a bad real estate valuation report, something of that sort. This does not talk to me in so many terms as we are talking about the loans, the kind of things. You're talking about the servicing of the loans. Am I missing something here? It's significant because this resulted in almost a drop of more than half of the share price. Yes. Chief Judge, we've been focused here today on the Taylor Ranch and the U.S. mortgage loan because I think that's among the most egregious activity that we've alleged. There are other allegations in the complaint, and they include asset valuation issues, specifically with the TCP asset valuation. It was an asset that they carried on their balance sheet, which, as represented, was 20 percent of the assets of the company. Later, they said, oh, no, it's not worth the $33 million. I mean, I don't have the exact numbers. The $33 million we claim it's worth, it's actually only worth a third of that. It's worth $11 million. And the reason they threw forth saying that why they had to write down this asset by 66 percent was that, oh, now we're selling it, and since we're selling it, we're not going to get full value for it. Now, I certainly agree that if you're in a selling situation and people know you have to sell, you might take a discount. But if my house is worth a million dollars and I get transferred to California and I have to sell it, I'm not going to sell that house for $300,000. I may have to sell it for $950,000 or $900,000. But their purported explanation for why they had to write down a 20 percent asset on their books simply because they had to sell it and it lost two-thirds of its value is ridiculous. Let's get back to the loans. Where in here do you allege the bad loans as the reason for this price drop? Which lines of the complaint, which paragraph and which lines make that claim in your view? I'm sorry. I didn't hear the whole question. Let's get back to the loans. Sure. And the improperly reported loans, what you're alleging improperly reported loans. Yes. Where in the complaint do you say the improperly resulted loans resulted when disclosed resulted in a decrease in the price of stock? Which actual words in the complaint allege that? Sure. Your Honor, I think this ties back into Judge Wallace's question that he started the argument with. The precise disclosure of the loans occurred after the class period. But what we allege is that the effect of the loans was being disclosed throughout the class period, including in the paragraph 215 that you previously identified. Yes. But remember, one more question. Which words? You say that this is what you've alleged. But I'm asking you for specific words in the complaint that made that allegation.  Well, I think it's in paragraph 215, Your Honor, where we say the effect of the article was apparent on March 24th as well, with the stock opening at 168 and closing at 153. I mean, what we're required to allege under DORA and this circuit's opinion in Dow is to give them some idea of what our theory is of loss causation. This is the financial difficulties that you have in line 2 of paragraph 215. And what you're saying is these financial difficulties are the financial difficulties stemming from these loans. Yes, Your Honor. And where is this alleged? I mean, this says there was a press release that talked about financial difficulties. How do we know that these are the same financial difficulties that are growing out of this loan? Well, to specifically answer your question, Your Honor, without reading every paragraph of the 200-paragraph complaint, standing here at this moment, I can't direct you to another specific line that lays it out in the terms that you would like it laid out in. Well, feel free to submit a 28-J letter pointing it. If you have a good answer to this question, go home and read the complaint and send us a notice, and then our opposing counsel can answer by 28-J letter. I'm not saying you must do this, but if you do have an answer and you can't find it in the complaint now, you should feel free to let us know. Thank you, Your Honor. There being no further questions, thank counsel. The case is signed and will stand submitted.
judges: Kozinski, Wallace, Smith